Receipt 3716

# ORIGINAL

ECF

FILED
FEB 3 2006
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DESERET MANAGEMENT CORPORATION, Plaintiff, | ) | |
| v. | ) | Case No. 06-86 T |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

## COMPLAINT

Plaintiff, Deseret Management Corporation ("DMC"), brings its Complaint against the United States of America for the recovery of income taxes and related interest erroneously assessed and illegally collected by the Internal Revenue Service (the "Service"). As grounds for this Complaint, DMC alleges as follows:

## THE PARTIES

1. DMC is a corporation organized under the laws of Utah with its principal place of business at 60 East South Temple Street, Suite 575, Salt Lake City, Utah 84111. DMC is a holding company for various subsidiaries, including Bonneville International Corporation ("BIC"), which is in the business of owning and operating radio and television stations, and Beneficial Life Insurance Company ("Beneficial"), which is in the financial services and life insurance business. DMC's Taxpayer Identification Number is 87-0274433. For the tax years 1995 through 1998, DMC filed a consolidated income tax return on behalf of itself and its subsidiaries.

2. Defendant is the United States of America.

## JURISDICTION AND VENUE

3. Jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. § 1346(a)(1) for the recovery of internal revenue tax erroneously and illegally assessed and collected by the Service.

## INTRODUCTION

4. DMC challenges the following erroneous determinations on which the Service based its denial of DMC's refund claims for tax years 1995 through 1998:

(a) The Service erroneously determined the fair market value of certain television station assets sold by BIC in 1995 and erroneously treated as part of the sale certain alleged television station assets that, in fact, did not exist.

(b) The Service erroneously determined DMC's gain on the 1995 sale of the television station assets.

(c) The Service erroneously determined the charitable contribution deduction for DMC's consolidated life/non-life taxable income.

(d) The Service erroneously applied Treas. Reg. § 1.170A-11T(b)(2) and I.R.C. § 1503(c)[b] in the 1995 and 1997 tax years in determining DMC's allowable Net Operating Loss ("NOL") deduction.

5. As the result of the errors identified in paragraph 4 above, the Service erroneously increased DMC's taxable income in each of the four tax years at issue, and improperly and unlawfully assessed and collected taxes and deficiency interest against DMC. As a consequence, DMC seeks a refund in this action as follows:

| **Tax Year** | **Refund Claimed** |
|---|---|
| 1995 | $20,413,670 |
| 1996 | $3,032,852 |
| 1997 | $5,049,286 |
| 1998 | $225,439 |
| **TOTAL** | **$28,721,247** |

**PROCEDURAL HISTORY**

6. DMC timely filed consolidated income tax returns for the tax years 1995, 1996, 1997 and 1998 with the Internal Revenue Service Center, Ogden, Utah. The errors identified in paragraph 4 above and the refund amounts claimed in paragraph 5 above result primarily from the Service's upward adjustment of DMC's taxable income for the tax year 1995 of $36,566,071 (the "1995 Adjustment").

7. The Service first proposed the 1995 Adjustment in a Notice of Proposed Adjustment dated September 9, 2002, directed to Issue No. 41-1 of the DMC tax audit for the 1994-95 audit cycle ("NOPA 41-1").

8. On March 28, 2003, the Service issued to DMC a form letter 950 with respect to tax years 1995 through 1998 (the "thirty-day letter"). The thirty-day letter advised DMC of (a) the deficiencies in tax asserted by the Service as the result of its examination of DMC's tax returns and (b) DMC's right to pursue an administrative appeal. The thirty-day letter incorporated as a basis for its asserted deficiencies an examination report that included NOPA 41-1, among various other NOPA's. The thirty-day letter, including the examination report (without lengthy exhibits) and NOPA 41-1, is attached hereto as Exhibit A.

9. The thirty-day letter alleged an aggregate deficiency in payment of taxes for the four tax years. This claimed deficiency included amounts resulting *inter alia* from the 1995 Adjustment.

10. On April 24, 2003, to avoid the accrual of further interest with respect to any claimed deficiency, DMC paid to the Service the entire amount of the claimed deficiency, with accrued interest thereon. This payment included the amounts for which DMC seeks a refund in this action, as set forth in paragraph 5 above.

11. Pursuant to agreement with the Service, on July 14, 2003, DMC filed its Protest of the adjustments proposed in the thirty-day letter.

12. On September 11, 2003, the Service provided its Rebuttal of the Protest.

13. In November 2003, the Service and DMC held a conference with the Service's Appeals Office, commencing a process to attempt to negotiate a resolution of all issues between the parties for the tax years in question.

14. After extended negotiations, including post-appeals mediation in July 2004, DMC and the Service resolved all issues raised in the thirty-day letter other than those arising from the 1995 Adjustment.

15. On April 4, 2005, the Service issued a Notice of Deficiency with respect to the tax years 1995 through 1998, which reflected the tax impact of the sole issue remaining after appeals: the 1995 Adjustment. The Notice of Deficiency is attached hereto as Exhibit B.

16. By reason of the carryover of certain NOLs in the tax years at issue, the 1995 Adjustment as set forth in the Notice of Deficiency impacted not only 1995, but each subsequent tax year through 1998.

17. The 1995 Adjustment as applied to these tax years also made necessary certain charitable contribution computations that produced the error referenced in paragraph 4(c) above.

18. In the course of calculating the numbers set forth in the Notice of Deficiency, the Service introduced for the first time the error identified in paragraph 4(d) above.

19. On May 11, 2005, DMC executed a Form 4089, Notice of Deficiency - Waiver, agreeing that the Service could assess the amounts set forth in the Notice of Deficiency without further delay, subject to and preserving DMC's right to seek a refund of amounts previously paid.

20. On June 27, 2005, the Service sent to DMC Notice No. CP210, setting forth a statement of adjustment to DMC's account for each tax year at issue consistent with the numbers set forth in the Notice of Deficiency.

21. On September 15, 2005, DMC filed with the Service an Amended U.S. Corporation Income Tax Return, Form 1120X (each denominated "Claim For Refund"), for each of the tax years 1995 through 1998, seeking refund of the amounts set forth in paragraph 5 above. The Amended Returns for these four tax years are attached hereto as Exhibits C, D, E and F, respectively.

22. On November 10, 2005, in anticipation of bringing this refund action, DMC executed Form 2297, Waiver of Statutory Notification of Claim Disallowance, and Form 3363, Acceptance of Proposed Disallowance of Claim for Refund or Credit, with respect to the amounts claimed in the Amended Returns. These executed Forms are attached hereto as Exhibit G.

23. The present action seeks refund of the amounts set forth in the Amended Returns filed on September 15, 2005, plus interest on those amounts since payment.

## VALUATION OF KIRO-TV ASSETS

### Introduction

24. The 1995 Adjustment results primarily from the Service's erroneous determination that DMC underreported the taxable gain from the February 1, 1995 sale by BIC to A.H. Belo, Inc. ("Belo") of certain television station assets owned by BIC's subsidiary, KIRO, Inc.

25. Consequently, the principal issue in determining whether DMC is entitled to the requested refund is this: **What was the fair market value as of February 1, 1995 of the assets transferred by BIC to Belo?**

26. The Service erroneously claims that the assets had a fair market value on that date of $89,296,000.

27. In fact, on February 1, 1995, those assets had a fair market value of $41,433,000.

### KIRO-TV

28. KIRO-TV is a very high frequency ("VHF") television station with a television broadcasting license issued by the Federal Communications Commission ("FCC") that permits the station to operate in the Seattle, Washington area (the "FCC License"). Aside from the KIRO-TV FCC license, in 1995 there were only four other FCC licenses for the operation of commercial VHF television stations in Seattle or Tacoma, Washington.

29. Prior to February 1, 1995, BIC's subsidiary KIRO, Inc. owned the assets of KIRO-TV with the exception of the FCC License and the station's network affiliation agreement with CBS (the "Network Affiliation Agreement").

30. Bonneville Holding Company ("BHC"), a tax-exempt entity owned as of February 1, 1995, by Corporation of the President of The Church of Jesus Christ of Latter-day Saints, owned both the FCC License and the Network Affiliation Agreement.

31. KIRO-TV operated pursuant to the FCC License and the Network Affiliation Agreement.

**Agreement To Sell KIRO-TV**

32. Upon learning in the fall of 1994 that CBS would not renew the Network Affiliation Agreement when it expired in March 1995, BIC and BHC decided to sell their respective interests in KIRO-TV rather than operate KIRO-TV as a new independent, unaffiliated station in the Seattle/Tacoma market.

33. Belo agreed to purchase KIRO-TV from BIC and BHC for a negotiated price of $162.5 million (the "KIRO-TV Transaction"), which was the fair market value of KIRO-TV as of February 1, 1995.

34. BIC and Belo agreed to structure their portion of the transaction as a sale of stock treated as a sale of assets by an election under I.R.C. § 338(h)(10).

35. To facilitate the sale as structured, BIC caused KIRO, Inc. to form a subsidiary, Third Avenue Television, Inc. ("TAT"), to which KIRO, Inc. transferred all the assets of KIRO-TV that it owned in return for all the stock of TAT. KIRO, Inc. then sold the stock of TAT to Belo. (For ease of reference in this Complaint, DMC will refer to the assets Belo acquired from BIC on February 1, 1995, as the "BIC assets." The phrase "KIRO-TV assets" will refer to all assets that Belo acquired in the February 1, 1995, transaction – both the BIC assets ***and*** the FCC License and Network Affiliation Agreement that Belo acquired from BHC.)

**Closing And Appraisal Of KIRO-TV Assets**

36. The sale closed on February 1, 1995, with Belo paying a total purchase price of $162.3 million, reduced from the original price of $162.5 million as the result of closing adjustments.

37. Pursuant to their agreement, Belo and BIC each retained an appraisal firm that was experienced in the broadcast industry to identify, and to render their expert opinion of the fair market value for, each KIRO-TV asset.

38. Those two appraisal firms, working independently, each rendered an opinion of value with respect to each KIRO-TV asset.

39. BHC then retained a third appraisal firm to review the work of the first two appraisal firms and, in particular, to give expert advice with respect to the preferred methodology for determining the fair market value of the FCC license.

40. As provided in their agreement, the parties then calculated the value of each KIRO-TV asset for reporting purposes by reconciling and averaging the valuations and opinions provided by the appraisers.

41. The parties used the values thus established to divide Belo's purchase price between BIC and BHC and to determine the taxable gain or loss on the sale of the BIC assets that DMC reported on its 1995 consolidated income tax return.

42. BHC's gain or loss from the sale of the FCC License and the Network Affiliation Agreement (which had no value because of its pending expiration) was not included on DMC's 1995 return as BHC was not a member of DMC's consolidated group for income tax reporting purposes.

**The Service's Examination Of The KIRO-TV Sale**

43. Based on the established fair market values for the BIC assets, BIC received $52,529,929 of the purchase price and BHC received the balance.

44. In the course of examining DMC's tax returns for 1995 through 1998, the Service retained DKB Consulting ("DKB") to review and critique the appraisals on which DMC had relied to determine the gain on the sale of the BIC assets as reported on its 1995 income tax return.

45. DKB took the position that the appraisers retained by Belo, BIC and BHC were wrong with respect to the valuation of several KIRO, Inc. assets, and that those appraisers had also failed to value several important KIRO, Inc. assets.

46. The Service adopted the DKB valuations and determined its proposed adjustment using those valuations. *See* Form 886-A, p. 2, part of NOPA 41-1, which is included as part of Exhibit A.

**Conclusions Adopted By The Service And Not In Dispute**

**Asset Valuations – Not In Dispute**

47. As set forth more fully in the Explanation attached to the Forms 1120x (Exhibits C through F), DMC accepts and does not dispute the Service's valuation conclusions with respect to eighteen (18) of the approximately twenty-six (26) separate BIC assets identified by either the Service's appraiser DKB or the appraisal firms retained by the parties to the KIRO-TV transaction.

48. The table below identifies by category each of the Service's eighteen (18) BIC asset valuations that **DMC does not dispute**. The total value of these eighteen assets – $33,060,000 – is **not in dispute**:

| | |
|---|---|
| Studio Technical Equipment | $18,502,000 |
| Land | 4,740,000 |
| Vehicles | 1,496,000 |
| TV Transmitter Equipment | 1,445,000 |
| Audiovisual Library | 1,399,000 |
| Office Equipment | 1,286,000 |
| Microwave Equipment | 1,129,000 |
| Furniture & Fixtures | 868,000 |
| Towers | 550,000 |
| TV Antenna System | 336,000 |
| Computer Software | 320,000 |
| Test Equipment | 245,000 |
| Spare Parts | 239,000 |
| Translator Equipment | 195,000 |
| Program Prod. Material/Tape Stock | 157,000 |
| Surplus Equipment | 102,000 |
| Tools | 51,000 |
| Promotional Materials | -0- |
| **Total BIC Asset Value Not In Dispute** | **$33,060,000** |

**Valuation Methodology – Not In Dispute**

49. A major component of the analysis employed by each appraiser, both the appraisers retained by the parties to the transaction and the Service's retained appraiser DKB, was to establish a value for the FCC License owned by BHC.

50. The Service's appraiser DKB chose to value the FCC License utilizing a residual fair market value method, which DKB called the "residual method." This Complaint adopts DKB's nomenclature and will hereinafter use the "residual method" to refer to the residual fair market value method.

51. An appraiser employing the residual method identifies and determines the value of every station asset other than the FCC license, then subtracts the total value of those assets from the negotiated fair market value of the entire station. The fair market value that remains, or the "residual," is the fair market value of the FCC license.

52. In choosing the residual method, DKB rejected as "weak" the discounted cash flow method as an approach to valuing the FCC License.

53. DKB was correct in choosing to use the residual method and in rejecting the discounted cash flow method to value the FCC License.

54. DMC agrees with both DKB's use of the residual method and DKB's rejection of the discounted cash flow method for determining the value of the FCC License.

**The Absence Of Goodwill – Not In Dispute**

55. DKB expressly did not assign any value to goodwill, concluding that this asset could not be valued.

56. DKB was correct in assigning no value to goodwill.

57. DMC agrees with DKB's conclusion with respect to goodwill and, like DKB and the Service as set forth in NOPA 41-1 and in the Notice of Deficiency, attributes no value to goodwill.

**Valuation Conclusions In Dispute**

**Introduction**

58. To evaluate the DKB conclusions adopted by the Service and to obtain an opinion of value with respect to the KIRO-TV assets, separate and independent from those offered at the time of the February 1, 1995, transaction, DMC retained appraiser Charles H. Kadlec ("Kadlec").

59. Based on Kadlec's report, informed by the work of the original appraisers, DMC rejected and continues to reject DKB's valuations, as adopted by the Service, with respect to the categories of BIC assets identified by DKB and the Service as follows:

- Advertiser Relationship
  Pre-Sold Advertising Contracts

- Buildings

- Third Avenue Productions
  KIRO Direct

- Going Concern
  Assembled Staff/Workforce

- Acquired Program Contracts

<u>**Advertiser Relationship And Pre-Sold Or Acquired Advertising Contracts**</u>

60. The Service contends that DMC failed to recognize a gain in the amount of $38,100,000 arising from the sale to Belo of what DKB and the Service chose to call the "Advertiser Relationship Asset," defined by DKB as the value of future cash flows to the owner of KIRO-TV from anticipated business with existing advertisers. In fact, no such asset existed.

61. None of the three original appraisers who valued or considered the valuation of the KIRO-TV assets identified or made any mention of an "advertiser relationship asset." Kadlec identified and valued "likely contract renewals" at $306,000, which he included as part of the value of "Acquired Advertising Contracts," bringing the total value of such contracts to $2,345,000.

62. Advertisers choose to do business with a television station because of the number and type of viewers who watch the station, not because of some preference for or bond of loyalty to the station entirely unrelated to the numbers or types of viewers who watch the station. In turn

the number and type of viewers that a station can deliver to advertisers is directly related to the station's programming.

63. Advertisers did business with KIRO-TV in 1995 based on the viewers drawn to the station by its programming.

64. The termination of the Network Affiliation Contract caused KIRO-TV to lose nearly all of its most popular programming and eliminated any expectation of continuity of viewership after the February 1, 1995 sale.

65. KIRO-TV in 1995 did not enjoy any additional advantage from advertiser preference or loyalty unrelated to viewers who were attracted to the station's programming, and advertiser preference and loyalty were not components of the assets purchased by Belo.

66. The Service also determined a value of $390,000 for "Pre-Sold Advertising Contracts."

67. The Service's combined value of $38,490,000 for an alleged "Advertiser Relationship Asset" and "Pre-Sold Advertising Contracts" is erroneous.

68. Kadlec's valuation of "Acquired Advertising Contracts" of $2,345,000 is the correct valuation of the advertiser related assets acquired by Belo in February 1995.

69. As a result of its error, the Service has overstated the value of the BIC assets by $36,145,000, which has resulted in a corresponding overstatement of DMC's tax liability. DMC is entitled to a refund for the corresponding amount of tax paid, with interest.

**Real Estate – Buildings**

70. The assets sold as part of the KIRO-TV transaction in February 1995 included the buildings that housed KIRO-TV's operations.

71. These buildings were constructed in the 1960's not only to house broadcast operations as carried on at the time, but also to serve as a symbol of and showcase for the station. At the time, prevailing technology and general industry practices for network affiliates dictated a large and visually imposing broadcast facility.

72. The facility constructed in the 1960's included several large studios designed to accommodate the bulky technical equipment of the day and to permit production of a substantial number of local programs.

73. Three decades later, by the time of the sale of KIRO-TV in 1995, advanced broadcast production techniques and miniaturization of equipment, together with a significant reduction in the use of locally produced programming, had rendered obsolete buildings of the size and design of the KIRO-TV facilities. The showcase feature of the facilities had become superfluous and much of the space in the buildings was not needed for broadcast operations.

74. In light of the obsolescence of the KIRO-TV buildings, the fair market value of those buildings as part of the February 1, 1995 sale did not exceed $4,386,000, and no willing buyer of KIRO-TV would have paid more than that amount for the KIRO-TV buildings.

75. DKB and the Service erroneously determined that the value of the KIRO-TV buildings at the time of the 1995 sale was $10,195,000.

76. The Service's adjustment of DMC's tax liability based on a value of $10,195,000 for the KIRO-TV buildings overstates the value of those buildings by $5,809,000 and DMC is entitled to a refund for the corresponding amount of tax paid, with interest.

**Support Operations – Third Avenue Productions And KIRO Direct**

77. The Service, in reliance on the DKB appraisal, contends that DMC failed to recognize a total gain of $3,500,000 from the sale of two support operations of KIRO-TV: Third

Avenue Productions ("Third Avenue"), an in-house production arm for commercials and programs, and KIRO Direct, a one-person, in-house direct mail service. The Service's contention in this regard is in error.

78. The activities of these support operations were integral to the station and did not have any value separate and apart from the aggregate value of the other tangible and intangible assets of KIRO-TV.

79. To the extent that Third Avenue or KIRO Direct performed any work for third parties, such work was incidental to these operations' core support role and did not represent an independent profit center for KIRO-TV.

80. None of the other appraisers who have valued KIRO-TV recognized Third Avenue and KIRO Direct as having any independent value.

81. The Service's adjustment of DMC's tax liability based on a combined value of $3,500,000 for Third Avenue and KIRO Direct is in error and DMC is entitled to a refund for the corresponding amount of tax paid, with interest.

**<u>General Operations – Going Concern/Assembled Workforce</u>**

82. The Service arbitrarily and erroneously determined that the value of the KIRO-TV assembled workforce was equal to 25% of the total annual employee payroll cost, or $2,950,000, and that the value of KIRO-TV's established business procedures was $480,000.

83. Kadlec in his expert appraisal report valued an asset denominated as "Going Concern." This asset included both the value attributable to KIRO-TV's in-place business procedures/organization and the value of its assembled and trained workforce.

84. To value the assembled and trained workforce, Kadlec performed a detailed analysis of the actual time and related costs necessary to recruit and train the employees of

KIRO-TV to perform their specific jobs. From this, he determined that the correct value of this asset, the assembled and trained workforce, was $1,046,000

85. Kadlec further determined that the correct value of KIRO-TV's established business procedures was $225,000.

86. The combined value attributable to KIRO-TV's in-place business procedures/organization and the value of its assembled and trained workforce is $1,271,000.

87. The Service's adjustment of DMC's tax liability based on a combined value of $3,430,000 for the assembled workforce and business procedures/organization of KIRO-TV overstates the value of those assets by $2,159,000 and DMC is entitled to a refund for the corresponding amount of tax paid, with interest.

**<u>Acquired Program Contracts</u>**

88. The Service erroneously determined the program contracts (consisting primarily of syndicated, off-network entertainment programming) acquired by Belo as part of the KIRO-TV transaction had a value of $600,000.

89. The correct value of these contracts, as determined by Kadlec, did not exceed $371,000 and DMC is entitled to a refund for the corresponding amount of tax paid, with interest.

**<u>Summary Of Valuation Conclusions In Dispute</u>**

90. The table below summarizes the KIRO, Inc. assets and valuations in dispute:

| | SERVICE | TAXPAYER | DIFFERENCE |
|---|---|---|---|
| ***1. Customer-Based Assets*** | | | |
| (a) Advertiser Relationship Asset | $38,100,000 | -0- | $38,100,000 |
| (b) Pre-sold or Acquired Advertising Contracts | 390,000 | 2,345,000 | (1,955,000) |
| **Sub-total** | | | **$36,145,000** |
| ***2. Real Estate*** | | | |
| Buildings | $10,195,000 | 4,386,000 | **5,809,000** |
| ***3. Support Operations*** | | | |
| (a) Third Avenue Productions | 3,200,000 | - 0 - | 3,200,000 |
| (b) KIRO Direct | 300,000 | - 0 - | 300,000 |
| **Sub-total** | | | **3,500,000** |
| ***4. General Operations*** | | | |
| (a) Assembled Staff/ Workforce | 2,950,000 | 1,046,000 | 1,904,000 |
| (b) Going Concern (Operations) | 480,000 | 225,000 | 255,000 |
| **Sub-total** | | | **2,159,000** |
| ***5. Programming*** | | | |
| Acquired Program Contracts | 600,000 | 371,000 | **229,000** |
| ***6. Rounding By The Service*** | 21,000 | -0- | **21,000** |
| **Total Valuation** | **$56,236,000** | **$8,373,000** | |
| **TOTAL OVERVALUATION BY THE SERVICE** | | | **$47,863,000** |

## DMC'S GAIN

91. The only consideration that BIC received from the sale of the BIC assets was cash in the amount of $52,529,929.

92. BIC's adjusted basis in these assets was $9,801,308, an amount that is not in dispute.

93. I.R.C. § 1001(a) provides that the amount of gain recognized from the sale of property shall be the excess of the amount realized over the adjusted basis.

94. I.R.C. § 1001(b) provides that the amount realized from the sale of property shall be the sum of money received plus the fair market value of any property (other than money) received.

95. Under I.R.C. § 1001(a), DMC's recognizable gain from the sale of the BIC assets cannot exceed the difference between the amount realized ($52,529,929) and BIC's adjusted basis in the property ($9,801,308), for a maximum recognizable gain of $42,728,621.

96. The Service determined DMC's gain by subtracting BIC's adjusted basis of $9,801,308 from the Service's claimed value of the BIC assets of $89,296,000, for an asserted taxable gain of $79,494,692.

97. The Service's computation of DMC's gain erroneously includes an allocation and assignment to BIC of a portion of BHC's proceeds from the sale of KIRO-TV.

98. There was no transaction between BIC and BHC.

99. In the absence of a transaction between BIC and BHC, the Service has no legal authority to treat consideration received by BHC as actually having been received by BIC.

**LIFE/NON-LIFE CONTRIBUTION OFFSET**

100. Treas. Reg. § 1.1502-24 provides that in all consolidated returns taxpayers determine the limitation on the ultimate amount of their deductible contributions using the total consolidated taxable income method of all entities under a single entity theory. There is no stated exception to this rule for situations such as the consolidated return filed by DMC, which has both life and non-life subsidiaries.

101. Notwithstanding this regulation, the Service erroneously determined the charitable contribution limitation for DMC in the relevant tax years by using the subgroup method of Treas. Reg. § 1.1502-47 even though there are no overriding provisions in that regulation pertaining to the computation of allowable charitable contributions.

102. This error resulted in an overstatement of DMC's charitable contribution deduction in some or all of the tax years at issue.

103. While this overstatement favors DMC if viewed in isolation in the years at issue, if left uncorrected, it will adversely impact DMC in subsequent years. Further, a corrected determination of this deduction is necessary in order to determine the proper NOL deduction for each of the years at issue.

**NON-LIFE LOSS OFFSET AGAINST LIFE INCOME**

104. The Service erroneously applied Treas. Reg. § 1.170A-11T(b)(2) and I.R.C. § 1503(c)[b] by failing to use the full available non-life NOL (including allowing for the charitable contribution deduction) to offset DMC's life income (subject to the 35% limitations of I.R.C. § 1503(c)[b](1)).

105. The Service's error is predicated on the incorrect position that "converted" contributions cannot be used to offset life income in the current year, but may only be carried

over to future years. The intent of Treas. Reg. § 1.170A-11T(b)(2) is to reflect the allowable charitable contribution as a current year deduction and available as part of a NOL carryforward in a situation where the corporate taxpayer does not otherwise have taxable income in the current year.

106. The Service's position is contrary to the plain language of I.R.C. § 1503(c)[b], which requires DMC to use the entire available NOL (including the allowable for the charitable contribution deduction and subject to the 35% limitations) to offset its life income in calculating its final consolidated taxable income. The Service's error decreased DMC's allowable NOL deduction by $1,465,309 in 1995, and increased DMC's allowable NOL deduction by $695,964 in 1997, for a net erroneous decrease in allowable NOL deduction of $769,345.

## CLAIMS FOR RELIEF

## COUNT I

## CLAIM FOR TAX REFUND RELATED TO THE ERRONEOUS VALUATION OF THE BIC ASSETS

107. DMC repeats and realleges each and every allegation contained in paragraphs 1 through 106 of the Complaint as if fully set forth herein.

108. In determining the amount of DMC's recognizable gain from the 1995 sale of KIRO-TV, the Service erroneously treated as assets having value (a) the "advertiser relationship," (b) Third Avenue, and (c) KIRO Direct, and incorrectly valued (a) the pre-sold advertising contracts, (b) KIRO-TV buildings, (c) assembled staff/workforce, (d) going concern, and (e) acquired program contracts. These errors resulted in the Service improperly increasing the value of the BIC assets by $47,863,000.

109. As a result of these erroneous determinations and their impact on 1995 and subsequent tax years at issue, DMC is entitled to a refund of income taxes and deficiency interest

improperly and unlawfully assessed and collected in an amount not less than $28,721,247, together with interest on the total overpayment.

**COUNT II**

**COMPUTATION OF GAIN ON SALE OF KIRO, INC. ASSETS**

110. DMC repeats and realleges each and every allegation contained in paragraphs 1 through 109 of the Complaint as if fully set forth herein.

111. Under I.R.C. § 1001(a), the Service was required to determine DMC's gain on the sale of the BIC assets by subtracting BIC's adjusted basis in the assets from the proceeds of the sale received by BIC.

112. Any gain recognized by DMC from the sale of the BIC assets cannot exceed the sum of $42,728,621.

113. DMC is entitled to a refund of income taxes and deficiency interest improperly and unlawfully assessed and collected based on the recognition of any gain in excess of $42,728,621, together with interest on the total overpayment.

**COUNT III**

**LIFE/NON-LIFE CONTRIBUTION OFFSET**

114. DMC repeats and realleges each and every allegation contained in paragraphs 1 through 113 of the Complaint as if fully set forth herein.

115. The Service erroneously used the subgroup method rather than the consolidated life/non-life taxable income method to determine the charitable contribution limitation for DMC in the relevant tax years.

116. This error results in a misstatement of DMC's charitable contribution deduction in some or all of the tax years at issue and DMC is entitled to an adjustment of its taxable income to reflect the correct amount of the charitable contribution limitation.

## COUNT IV

## NON-LIFE LOSS OFFSET AGAINST LIFE INCOME

117. DMC repeats and realleges each and every allegation contained in paragraphs 1 through 116 of the Complaint as if fully set forth herein.

118. The Service's error in its application of Treas. Reg. § 1.170A-11T(b)(2) and I.R.C. § 1503(c)[b] decreased Taxpayer's allowable NOL deduction by $1,465,309 in 1995, and increased the Taxpayer's allowable NOL deduction by $695,964 in 1997, for a net incorrect decrease in allowable NOL deduction of $769,345.

119. DMC is entitled to a refund of income taxes and deficiency interest for the tax years 1995 and 1997, by reason of the net erroneous decrease in allowable NOL deduction of $769,345, together with interest paid on that amount and prejudgment interest to the date of payment.

## RELIEF

WHEREFORE, plaintiff Deseret Management Corporation demands Judgment against the defendant United States of America as follows:

A. Under Count I, award of a refund of income taxes and deficiency interest in the amount an amount not less than $28,721,247, together with interest on the total overpayment as provided by law, and the costs, expenses and disbursements of this action.

B. Under Count II, pleading in the alternative, award of a refund of income taxes and deficiency interest assessed and collected based on the recognition of any gain from the sale of

the assets of KIRO, Inc. in excess of $42,728,621, together with interest on the total overpayment as provided by law, and the costs, expenses and disbursements of this action.

C. Under Count III, an adjustment of DMC's taxable income to reflect the correct amount of the charitable contribution limitation and resulting deduction for the tax years at issue.

D. Under Count IV, an adjustment of DMC's taxable income for the tax years 1995 and 1997 to reflect the correct amount of the allowable NOL deduction and an award of a refund of the resulting income taxes and deficiency interest erroneously assessed and collected, together with interest on the total overpayment as provided by law, and the costs, expenses and disbursements of this action.

Respectfully submitted this 3rd day of February 2006.

Eric C. Olson (Attorney of Record)
Tel. (801) 321-4818
Fax: (801)321-4893
KIRTON & McCONKIE
60 East South Temple Street, Ste. 1800
Salt Lake City, Utah 84111

J. Michael Hines
Judith A. Mather
Tel: (202) 776-2000
Fax: (202) 776-2222
DOW, LOHNES & ALBERTSON, PLLC
Suite 800
1200 New Hampshire Avenue, N.W.
Washington, D.C. 20036

COUNSEL FOR DESERT MANAGEMENT CORPORATION