IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DESERET MANAGEMENT CORPORATION | ) | |
| | ) | Case No. 06-86 T |
| | ) | |
| Plaintiff, | ) | Judge Emily C. Hewitt |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER RE: DEPOSITION OF DAVID K BIVINS**

The plaintiff Deseret Management Corporation ("DMC"), through counsel, submits this Opposition to the Motion for Protective Order filed by the defendant United States of America (the "Government") to prevent DMC from taking the deposition of David K Bivins ("Bivins").

**INTRODUCTION**

Bivins' expert reports set forth the sole existing rationale for the amount of the tax deficiency proposed in the thirty-day letter dated March 28, 2003, adopted in the Notice of Deficiency dated April 4, 2005 and adopted in the Statement of Adjustment dated June 27, 2005. *See* Complaint ¶¶ 8, 15 and 20. At this early stage of the proceedings, with the Government professing complete ignorance regarding the numbers on which it based the tax assessment at issue (First Amended Answer ¶¶ 47 through 90) and acknowledging that it has no expert, the Government cannot meet its burden on a motion for protective order to establish that Bivins' historic appraisal work will not lead to the discovery of admissible evidence.

Moreover, contrary to the Government's contentions, Bivins is not a RCFC 26(b)(4)(B) "consulting expert." He wrote his two appraisal reports early in the audit process, years before the filing of this litigation. The reports were provided almost immediately to DMC. If Bivins' work was "in anticipation of litigation," all fact development at the audit stage would be subject to protection under either RCFC 26(b)(3) (work product) and 26(b)(4)(B)(consulting expert).

Finally, the Government has rejected Bivins' methodology and certain of his conclusions, despite nearly eight years of advancing Bivins' views as the truth regarding the value of the KIRO-TV assets sold in 1995. Now, the Government wishes to conform the "truth" in this action to an unproven and highly speculative methodology that values only the single asset not subject to taxation: the FCC license. This sea change is so radical and profound in the context of the present litigation that, until the most recent filing, the Government declined even to mention Bivins by name. Such a shift, in the midst of a long-standing tax dispute, constitutes "exceptional circumstances" sufficient to overcome any objection to Bivins' deposition. The fact that the Government has gone to such extreme lengths to bring this litigation in line with its methodology *du jour* – seeking to recover documents in the possession of Bivins and seeking an absolute bar to his deposition – underscores the potential necessity of his testimony to clarify what the Government once offered as the "truth" and what it now says that "truth" to be.

**STATEMENT OF FACTS**

The following facts bear on the pending Motion:

1. The Government's Initial Disclosures (at pages 2 and 3 of Exhibit A to the Plaintiff's Opposition to Motion for Reconsideration filed November 28, 2006) list as persons with "discoverable information," the following seven persons who have participated in or

rendered expert appraisals of the KIRO-TV assets owned by DMC's subsidiary Bonneville International ("BIC") (numbering from original):

4. Monty A. Careswell (IRS valuation specialist who authored NOPA 41-1)

9. James Bond
10. Timothy Bresien
11. B. Carol Eaton
**Bond & Pecaro, Inc.** (appraiser hired in 1994 by the purchasers A. H. Belo)

13. Peter Bowman
**BIA Consulting, Inc**. (appraiser hired in 1994 by the for-profit seller BIC)

14. David H. Cole (appraiser hired in 1995 by the not-for-profit Bonneville Holding Company ("BHC"), seller of the FCC license)

15. Charles H. Kadlec (appraiser hired in 1999 by DMC to respond to Bivins)

2. Completely missing from this otherwise exhaustive list of experts who gave an opinion with respect to the value of the KIRO-TV assets sold in February 1, 1995, is the name of David K Bivins (also referred to by his business name "DKB Consulting" or simply "DKB").[1]

3. As required in the contract between A.H. Belo ("Belo") and BIC for the sale of KIRO-TV, DMC reported a gain on the sale of those KIRO-TV assets owned by BIC by calculating the average of the valuation of each such asset reported by Bond & Pecaro and BIA.

4. In December 1998, Bivins issued a forty-three (43) page appraisal of the KIRO-TV assets (not including extensive tables and appendices) referencing extensively the appraisal work performed by Bond & Pecaro, BIA Consulting and Cole.

5. In the "Statement of Work" dated March 3, 2000 (Exhibit B to Defendant's Reply in support of Motion for Relief dated December 1, 2006), the Government described Bivins' 1998 work as intended "to provide a basis for resolving the issue between the IRS and the

[1] DMC did list Bivins in its Initial Disclosures as a person with discoverable information. Bivins' work in 1998 and 2000 incorporated and/or commented on the work of each of the other persons performing appraisal work with respect to KIRO-TV and, at seventy pages of text and many hundreds of additional pages of exhibits, was easily the most voluminous of all appraisal reports.

Taxpayer without significant further activity, or that the issue would be elevated to the next level." *Id.* at 4 of 28. There is no mention in this "Statement of Work" that the work performed in 1998 by Bivins was "in anticipation of litigation."

6. The "Statement of Work" further noted that Charles Kadlec had responded to the December 1998 Bivins appraisal/report with an "appraisal critique." *Id.*

7. As a consequence of Kadlec's "appraisal critique," the Government hired Bivins to prepare a "rebuttal report" in response to the Kadlec report. *Id.*

8. The "Statement of Work" issued to justify the preparation in 2000 of that "rebuttal report" fails to makes any mention that the rebuttal report was prepared in "anticipation of litigation." *Id.*

9. To the contrary, the purpose of the twenty-seven page rebuttal report (issued in December 2001), as stated by the Government, was to "successfully point out [Kadlec's] error and reinforce [Bivins'] initial appraisal with a rebuttal appraisal." *Id.*

10. Both Bivins' December 1998 appraisal/critique and his December 2000 rebuttal report were provided to DMC in full at the time they were issued and they were prepared specifically for presentation to DMC to critique and rebut the work of the other appraisers.

11. Bivins included in his December 2000, rebuttal report as Table 4 (Exhibit A hereto) a summary of the conclusion of value of each of the other appraisers and his own conclusions of value with respect to all KIRO-TV assets.

12. On September 9, 2002, the Government issued its Notice of Proposed Adjustment, Issue No. 41-1 ("NOPA 41-1"). *See generally* Complaint, Exhibit A.

13. NOPA 41-1 was signed by Monty Careswell as "IRS Valuation Specialist." *Id.*

14. At pages 1 through 5, NOPA 41-1 included under the heading "Explanation of Items" a summary of the valuations reported in the return for all KIRO-TV assets owned by BIC and of the valuations for those assets established in the examination. For ease of reference, these pages of NOPA 41-1 are attached as Exhibit B.

15. As can be seen from a review and comparison of Exhibit A with Exhibit B, page 2, each of the appraised values of KIRO-TV assets owned by BIC listed in the fifth column of Table 4 to the Bivins 2000 rebuttal report corresponds with the amount listed in the column of NOPA 41-1, page 2, headed "Per Exam FMVs ($)."

16. Page 5 of NOPA 41-1 lists as the total "Adjustments" resulting from adoption of the numbers listed under "Per Exam FMVs ($)" an increase in long-term capital gains of $39,768,363 and a reduction in "Ordinary Gain" of $3,202,292.

17. On March 28, 2003, the Government issued its thirty-day letter with respect to the DMC audit for tax years 1995 through 1998. Complaint ¶ 8 and Exhibit A thereto; First Amended Answer ¶ 8.

18. At page C of the summaries attached to the thirty-day letter headed "Schedule of Adjustments," the Government included an entry under NOPA "41-1" of an increase in "long-term capital gains" of $39,768,363 and a reduction in "Ordinary Gain" of $3,02,292, the identical numbers found in NOPA 41-1. Exhibit C hereto.

19. In his 1998 and 2000 reports, Bivins identified, and calculated values for, twenty-five (25) separate categories of assets of KIRO-TV owned by BIC.[2] *See* Exhibit A.

20. The precise values established by Bivins in his reports were incorporated into NOPA 41-1. *See* Exhibit B hereto at 2.

---

[2] This does not count an entry in his reports labeled "rounding."

21. Having identified separately a value for each of the twenty-five categories, Bivins allocated the remainder of the $162.5 million consideration paid for KIRO-TV, or the "residual," to the FCC license owned by the not-for-profit BHC. Exhibit A hereto.

22. Bivins expressly noted in his reports that he chose to perform his valuation using the "residual" methodology for valuing the assets transferred to Belo rather than adopt a valuation of the FCC license utilizing a discounted cash flow methodology.

23. Bivins' 1998 and 2000 reports also set a value of $480,000 for "going concern" and "goodwill," with the acknowledgment that he had assigned no separate value to "goodwill." *See* Exhibit A and Complaint ¶¶ 55-57.

24. This amount was also incorporated into NOPA 41-1. *See* Exhibit B at 2.

25. In early 2004, the Internal Revenue Service (the "Service") circulated a draft Coordinated Issue Paper ("CIP") mandating use of a "direct" (as opposed to a "residual") method of valuation of the FCC license in like-kind exchanges. (Bivins had treated the residual value of the station after appraisal of all other station assets as the value of the FCC license.) Further, the draft CIP denominated any residual in the total purchase price after application of a direct method of valuation as "goodwill" (again contrary to what Bivins had stated regarding goodwill). The draft CIP is attached as Exhibit D.

26. The April 4, 2005, Notices of Deficiency included the same deficiency numbers found in the thirty-day letter as set forth in paragraph 18 above and these were confirmed in the Statement of Adjustment dated June 27, 2005. Complaint, Exhibit B and ¶ 20.

27. The final CIP, dated May 27, 2005, followed the draft in rejecting the residual method for valuing the FCC license as "impermissible" and suggested that taxpayers using that method could be subject to penalties. Exhibit D at 12 and Exhibit E hereto at parts 3(a) and 4.

## ARGUMENT

### I. THE GOVERNMENT HAS FAILED TO ESTABLISH THE PREMISE OF ITS MOTION: THAT BIVINS' DEPOSITION TESTIMONY WOULD NOT LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE.

RCFC 26(b)(1) authorizes discovery of "any matter relevant to the subject matter involved in the action." "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* In its Initial Disclosures, the Government made an important, if unintended, admission regarding the scope of discovery in this action and what constitutes "discoverable information," an admission that should resolve any doubt it now voices regarding the deposition of Bivins. The Government listed all seven appraisers, aside from Bivins, who had in any way investigated the fact question that now divides the parties: the value of the KIRO-TV assets that BIC transferred to Belo. If those experts have "discoverable information," so does Bivins.

DMC's burden as plaintiff in this refund action further establishes the potential relevance of Bivins' testimony. As stated in the case of *Publix Supermarkets, Inc. v. United States*, 26 Cl. Ct. 161, 166-67 (1992), a case cited by the Government, "there is a strong presumption of correctness of the findings of the Commissioner of Internal Revenue. . . ." As a consequence, in the first instance, "the taxpayer has the burden of rebutting that presumption" by proving with "'substantial evidence . . . the wrongfulness of the Commissioner's determination." *Id.* at 167. *See also Q.E.D., Inc. v. United States*, 55 Fed. Cl. 140, 143 (2003) (taxpayer must prove that "the assessment is incorrect and . . . the correct amount of tax. . . ."). To prove that specific numbers purporting to describe discrete facts in existence and incorporated into the thirty-day letter and the notice of deficiency are wrong, DMC must ascertain the basis for those factual assertions.

The deficiency stated by the Government was not the result of a single calculation; rather, it was the sum of multiple adjustments to the gains reported by DMC based on Bivins' separate valuations of over two dozen assets. As noted in paragraph 48 of the Complaint, Bivins' valuation of eighteen KIRO-TV assets did not produce an adjustment of the reported gain unfavorable to DMC. Thus, DMC accepts these adjustments as correct and does not challenge or seek to disprove the final sum of those adjustments in the notice of deficiency, to the extent that the Service's adjustment reflects those valuations. However, in light of the Government's refusal to admit what individual elements of the sum of adjustments are not in dispute, DMC needs to conduct discovery of Bivins on these points as well.

It seems particularly remarkable that the Government can state with such apparent certainty at this stage of the proceedings, well before it has even retained a valuation expert, that Bivins' conclusions will have no bearing on the opinions of whomever the Government will select to be its testifying expert. This foresight and certainty does not withstand scrutiny. Bivins' own work references the views and opinions of every expert who preceded him as well as (in the 2000 rebuttal report) those of Kadlec. How can the Government state with confidence that its replacement expert will decline even to consider the views of the numerous appraisers who have considered the issues now before the Court? And, if that expert picks and chooses among those opinions ignoring some or all opinions, isn't that fact of evidentiary consequence? Only if the Government anticipates now that it will tell the presently unknown expert how to perform her or his assignment and what assumptions to make and methodologies to employ could the Government say with any degree of confidence that its testifying expert's analysis will not rely on or reference in any way the facts stated by Bivins. Certainly, at this point in time, the Court should not circumscribe discovery based on such Government speculation.

## II. BIVINS IS NOT A CONSULTING EXPERT.

The role of Bivins in this matter is not that of "consulting expert." RCFC 26(b)(4)(B) protects from disclosure the facts known and opinions held by "an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial who is not expected to be called as a witness at trial. . . ." The Government stresses the fact that Bivins will not be called as a witness at trial but omits to make any showing that Bivins was retained "in anticipation of litigation or preparation for trial. . . ." The facts demonstrate that Bivins is not such an expert.

It is helpful to remember that the "question of value is one of fact. . . ." *Hermes Consolidated, Inc. v. United States*, 14 Ct. Cl. 398, 407 (1988). The Government hired Bivins in 1998, eight years before the filing of this litigation, to investigate the facts stated by DMC based on the work of the three appraisers hired to assist the parties to the KIRO-TV sale in obtaining the numbers ultimately reported in the DMC tax returns. As noted in the "Statement of Work" (Exhibit B to Defendant's Reply in support of Motion for Relief at 4 of 26), Bivins reached the conclusion that BIC realized $42 million more income from the sale than was reported in its tax return. His assertion in this regard was one of fact and it proved to be the commencement of this entire dispute.

In a very real sense, Bivins is the instigator of this litigation. He is not some bystander or consulting expert offering his views "off the record." His opinions were solicited for the purpose of verifying the facts stated regarding the amounts reported in the 1995 tax return and confronting DMC with an opposing view of the facts of the KIRO-TV sale. His valuation numbers – his assertions of fact – track to the penny the deficiency assessed and the amounts paid by DMC. The Government freely disclosed those opinions and their bases to DMC at the

audit stage. It never even hinted that it viewed Bivins as an expert retained in anticipation of litigation or in preparation for trial. His testimony is not shielded by RCFC 26(b)(4)(B).

In the end, the standard for "consulting expert" advanced by the Government would put off limits every trained person retained before the filing of litigation who might investigate or develop facts used to make a determination of tax liability. Indeed, this standard would apply with equal force to the experts hired by DMC and others listed by the Government in its Initial Disclosures. The broad definition of "in anticipation of litigation" applied to work product under RCFC 26(b)(3) would shield all information developed in the audit process from production. It is doubtful that the Government is proposing that all views expressed by experts previous to February 3, 2006, are not a proper topic for discussion at trial or that all documentation prepared by any party is work product. Absent such a concession, however, Bivins' testimony remains discoverable to the same degree as that of any other expert.

## III. DMC IS ENTITLED TO MORE THAN BIVINS' WRITTEN MATERIALS.

The Government argues that (a) DMC should be content with Bivins' written work product and (b) besides, Bivins probably cannot remember much about his "prior analysis and conclusions" given the "passage of time." Motion for Protective Order at 5-6, n. 5. This is an odd position. While limiting all discovery to paper would certainly simplify litigation and reduce expense, the Rules of this Court contemplate that a party may also take depositions. While, as the Government argues, depositions may not produce helpful information – memories fade, witnesses say nothing more than what they have written, or the trial court ultimately excludes the deposition testimony – that is the risk a deposing party takes. It is not a ground for obtaining a protective order prohibiting the discovery.

## IV. THE ABANDONMENT OF BIVINS AFTER EIGHT YEARS PRESENTS "EXCEPTIONAL CIRCUMSTANCES" THAT MANDATE DISCOVERY.

DMC must make a showing of "exceptional circumstances" *only if* Bivins is a RCFC 26(b)(4)(B) expert. The Government now takes the position that DMC must make this showing (Motion at 7) but was strangely silent on this point after (a) counsel's initial inquiry into Bivins' status in late September 2006, (b) counsel's further inquiry in e-mails dated October 27 and 30 and November 8, 2006, (Exhibit F hereto), and (c) in the course of e-mail correspondence about the scheduling of the Bivins deposition (Exhibit G hereto). Whatever the explanation for this silence, the facts of Bivins' role in this matter pre-litigation clearly present the "exceptional circumstances" authorizing inquiry into his knowledge.

The Government retained Bivins to state a view as to truth of certain facts – the value of various KIRO-TV assets owned by BIC on which any gain would be subject to tax. The Government held Bivins' testimony regarding the valuation of these assets to be such a powerful "truth" that it supplanted the combined opinions of three appraisers retained by the parties to the KIRO-TV sale with the Bivins' value conclusion as constituting the "true" facts regarding value. At no point over the course of eight years did the Government retreat from its position regarding the truth of Bivins' valuations. As late as a month ago, in its First Amended Answer, the Government declined to concede any error in the amount ultimately assessed against DMC.

This said, it comes as no surprise that Bivins will not be the Government's testifying expert. Bivins calculated the gain attributable to BIC (ultimately to DMC) by separately valuing each KIRO-TV asset owned by BIC and allocating the residual to the FCC license owned by BHC. This methodology comports with legal precedent (*see generally Meredith Broadcasting Co. v. United States*, 405 F.2d 1214, 1223, 1228 (1968)) and IRS directive (Rev. Proc. 75-39 (Exhibit G hereto). In 2004, the Service undertook to force taxpayers who were parties to tax

free exchanges of FCC licenses to value the licenses by a direct method rather than using a residual value. In a major departure from settled legal precedent and without any factual support for the proposition, the Service insisted that any residual after direct valuation of all identifiable assets be treated as goodwill.

This shift in policy was first articulated in the draft CIP issued in early 2004. The Service went so far as to declare that use of a methodology that treated the FCC license as the residual was “impermissible” and, as stated in the final CIP, potentially subject to penalties. Exhibit E at 12 and Exhibit G at part 4.

The voluminous Bivins appraisal materials and resultant conclusions, all premised on application of the residual methodology and rejecting the existence of any measurable goodwill, put the Government in a posture that, at best, is awkward and, at worst, indefensible. Even though this case does not involve a like-kind exchange, the Government finds itself, ten years down the road, having obtained payment of an asserted tax deficiency based on a methodology that it has declared impermissible and potentially subject to civil penalties.

This is not a simple matter of impeachment of an expert. It is impeachment of a party by its own expert and by the parties’ repeated solemn declarations of fact. The circumstances are “exceptional” and warrant full discovery of Bivins as a prelude to establishing the course of the Government in attempting to change the “facts” of this action by replacing the settled and accurate ruler by which such facts have been measured for decades with what, at best, is a speculative and easily manipulated measure.[3]

---

[3] The Government’s anxiety over the potential impact of this shift is underscored by the fact that nearly half of the items as to which the Government has claimed privileged in its two privilege logs (Exhibits 4 and 5 to Opposition to Motion for Relief filed November 28, 2006) involve communications in the 2004-2005 time period between persons involved in the audit and highly placed officials at the Service relating to the handling of this matter in the context of the Service’s shift in position.

## V. THE GOVERNMENT HAS ONLY ITSELF TO BLAME FOR ANY BURDEN OR PREJUDICE RESULTING FROM THE COURSE OF PROCEEDINGS TO DATE.

One final point in the Government's Motion deserves brief comment. At page 8 of the Motion under Conclusion, the Government declares that it "has been significantly burdened and prejudiced by plaintiff's unrelenting torrent of motions and discovery requests . . . ." DMC has filed one motion – the motion to strike. This is hardly a "torrent." (In contrast to DMC, the Government has filed at least five (5) motions, the present motion included.) It is of interest to note that this Court granted DMC's sole motion and the Government conceded belatedly through its most senior attorney (only after full briefing of two motions directed to the issue) that the motion to strike was well taken in light of DOJ's "longstanding archaic" pleading practices that were in violation of this Court's present rules. Transcript of November 29, 2006 hearing at 6.

The discovery sought by DMC is likewise unremarkable. DMC has served one (1) set of requests for production of documents (to which the Government, by its own admission, has not responded completely over six weeks after a response was due), one (1) set of requests for admissions (response due on December 8, 2006), and one (1) set of interrogatories (response alos due on December 8, 2006). In addition, DMC has noticed two (2) depositions of persons clearly connected to the facts at issue in this action. This is not burdensome discovery by any reasonable standard.

Any clutter and delay has resulted entirely from the Government's response to DMC's modest efforts to ascertain the facts not in dispute by pleading and by fact discovery in anticipation of naming its experts by February 28, 2006, as this Court has ordered. The Government repeatedly delayed filing its Answer and then filed an Answer that could not stand. It followed that with a non-responsive but technically permissible Amended Answer. When

asked to produce documents, the Government again delayed response, brought motions to extend time, claimed privilege with respect to over three hundred items (a privilege log running over eighty pages), and claimed the need to recover documents long known to be in the hands of a third-party expert. When advised that DMC wanted to talk to that expert, the Government said nothing, agreed to a schedule of depositions and then, on the eve of the November 29, 2006, hearing before the Court, first advised DMC that of its intent to resist the taking of the deposition. The Government need only look in the mirror to identify the party responsible for any disruption, burden or prejudice.

**CONCLUSION**

This Court should deny the Motion for Protective Order. The Government has failed to establish grounds under RCFC 26(c) for the relief it seeks.

Respectfully submitted,

s/ Eric C. Olson
Eric C. Olson (Attorney of Record)
Tel. (801) 321-4818
Fax: (801) 321-4893
KIRTON & McCONKIE
60 East South Temple Street, Ste. 1800
Salt Lake City, Utah 84111

December 5, 2006

**CERTIFICATE OF SERVICE**

I certify that service of the foregoing **OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER RE: DEPOSITION OF DAVID K BIVINS** has, this 5th day of December 2006, been made on Defendant by electronic mail and by mailing a copy thereof, in a postage prepaid envelope, to the following address

Jennifer Dover Spriggs
Court of Federal Claims Section
U.S. Department of Justice
Tax Division
Post Office Box 26
Ben Franklin Post Office
Washington, D.C. 20044

s/ Eric C. Olson
Eric C. Olson
KIRTON & McCONKIE
60 East South Temple Street, Ste. 1800
Salt Lake City, Utah 84111
Tel. (801) 321-4818
Fax: (801) 321-4893