# Internal Revenue Service IRS.gov

DEPARTMENT OF THE TREASURY

## Coordinated Issue Paper Media Industry - Like-Kind Exchanges Involving Federal Communications Commission Licenses

**Effective Date: May 27, 2005**

**Coordinated Issue Paper**
**Media Industry**

**Like-Kind Exchanges Involving Federal Communications Commission Licenses**
**UIL: 1031.02-00**

### Issues

1. Whether the exchange of a Federal Communications Commission broadcast license (FCC license) of a radio station for an FCC license of a television station is a like-kind exchange subject to the nonrecognition rules under section 1031 of the Internal Revenue Code.
2. Whether a network affiliation agreement and any claimed ability to affiliate should be valued separately from the FCC license under section 1031.
3. Whether goodwill should be valued separately from the FCC license under section 1031.
4. Whether accuracy-related penalties should be fully developed whenever a taxpayer fails to use a direct method to value the FCC license.

### Conclusions

1. The exchange of an FCC license of a radio station for an FCC license of a television station is a like-kind exchange subject to the nonrecognition rules under section 1031.
2. The network affiliation agreement and any claimed ability to affiliate should be valued separately from the FCC license under section 1031.
3. Goodwill should be valued separately from the FCC license under section 1031.
4. Accuracy-related penalties should be fully developed whenever a taxpayer fails to use a direct method to value the FCC license.

### Background

With the passage of the Telecommunications Act of 1996, Pub. L. 104-04, Congress relaxed radio and television station ownership regulations. Congress further relaxed the regulations in the Consolidated Appropriations Act, 2004, Pub. L. 108-199. These actions cleared the way for numerous exchanges of radio stations for television stations, also known as station swaps.

Section 1001(c) provides that the entire gain or loss on the sale or exchange of property shall be recognized. Section 1031(a)(1) provides that no gain or loss shall be recognized on the exchange of like-kind property held for productive use in a trade or business or for investment.

When applying section 1031 to station swaps, taxpayers should appraise the overall value of the stations and allocate that value among the underlying tangible and intangible assets.[1] Underlying intangible assets include the FCC licenses, any network affiliation agreements, going concern, and goodwill.

Radio network affiliation agreements, unlike television network affiliation agreements, generally have minimal value. Rev. Proc. 75-39, 1975-2 C.B. 569, 571. As a result, a taxpayer that exchanges an affiliated television station for a radio station must recognize the gain associated with the affiliation agreement.[2] In addition, the going concern and goodwill of one business is not like kind to the going concern and goodwill of another business. Treas. Reg. § 1.1031(a)-2(c)(2). Therefore, the taxpayer must also recognize the gain associated with going concern and goodwill.

Some taxpayers have taken the position that they do not need to recognize the gain resulting from the exchange of these intangibles under section 1031. They argue that radio and television FCC licenses are like-kind property. Further, they argue that the value of the FCC licenses includes the value of affiliation agreements and any ability to affiliate. They assume that stations have no goodwill. Accordingly, the gain associated with the exchange of these intangibles does not need to be recognized under section 1031.

Although radio and television FCC licenses are like-kind property for purposes of section 1031, taxpayers are incorrectly valuing the FCC license. The value of an FCC license does not include the value of the affiliation agreement, any claimed ability to affiliate, and goodwill. The sole property underlying an FCC license is the assigned frequency of the electromagnetic spectrum referred to in the FCC license. It is also wrong to assume that a station has no goodwill. Absent the application of some other nonrecognition provision of the Code, taxpayers engaged in station swaps should recognize any gain on the exchange of goodwill.

**Discussion**

**1. The exchange of an FCC license of a radio station for an FCC license of a television station is a like-kind exchange subject to the nonrecognition rules under section 1031.**

The determination of whether FCC licenses are like kind depends on: (a) the nature or character of the rights granted in the FCC licenses; and (b) the nature or character of the underlying property to which the FCC licenses relate. Treas. Reg. § 1.1031(a)-2(c)(1).

**(a) The differences between the rights granted in FCC radio and television licenses are differences in grade or quality, not differences in nature or character.**

An FCC license confers the right to use radio transmitting apparatus to broadcast on a designated channel and frequency range, at designated hours of operation, at designated geographic locations, at a maximum effective radiated power, and using antenna with certain antenna system specifications. Each FCC license states these rights, regardless of whether the license relates to an FM radio station, an AM radio station, or a television station.

The only differences between the various FCC licenses are the specific operating parameters (such as frequency, operating hours, power, and antenna information) and geographic location. These differences are merely differences in grade or quality. They are not differences in the nature or character of the rights granted in the FCC licenses.

**(b) The differences between the frequencies assigned to radio and television stations are differences in grade or quality, not differences in nature or character.**

The FCC has the specific power to "assign frequencies for each individual station and determine the power which each station shall use and the time during which it may operate." 47 U.S.C. § 303(c) (2004). An FCC license reflects the FCC's decision to assign a specific frequency of the electromagnetic spectrum to a particular licensee in a given broadcast area. Thus, the assigned frequency of the electromagnetic spectrum referred to in each license is the underlying property to which the license relates.

Both radio and television broadcasts are transmitted over the electromagnetic spectrum by radio transmitting equipment. Commercial AM radio stations are transmitted at frequencies between 535 and 1705 kilohertz. **Telecommunications**, 47 C.F.R. § 73.14 (2004). Commercial FM radio stations are transmitted at frequencies between 88 and 108 megahertz. **Telecommunications**, 47 C.F.R. § 73.201 (2004). Very high frequency (VHF) television stations, channels 2 through 13, are transmitted over frequencies from 30 to 300 megahertz. Ultra high frequency (UHF) television stations, channels 14 through 69, are transmitted over frequencies from 300 to 3,000 megahertz. U.S. Commerce Dep't Nat'l Telecommunications and Info. Admin., Spectrum Chart (Oct. 2003).

These differences between the frequencies assigned to radio broadcasts and television broadcasts are merely differences in grade or quality. They are not differences in nature or character.

In conclusion, an exchange of an FCC radio license for an FCC television license qualifies as a like-kind exchange under section 1031.

**(2) The network affiliation agreement and any claimed ability to affiliate should be valued separately from the FCC license under section 1031.**

A local television station may have an affiliation agreement with any of four networks, ABC, NBC, CBS, or Fox. A taxpayer should value its affiliation agreement separately from its FCC license. This is because, in the context of section 1031, the assigned frequency of the electromagnetic spectrum referred to in an FCC license is the sole underlying property to which the license relates. See **Meredith Broad. Co. v. United States**, 405 F.2d 1214, 1224, 1230 (Cl. Ct. 1968) (in the context of section 167, the court valued the television network affiliation agreements separately from the FCC licenses).

Instead of agreeing that a network affiliation agreement has any value, some taxpayers claim that the value of an affiliation agreement is really the station's "ability to affiliate."

They define this ability to affiliate as the competitive advantage a VHF station has over a UHF station in obtaining an affiliation agreement. They argue that this ability to affiliate is inherent in an FCC license and must be valued as part of that license. They then allocate all the value to the ability to affiliate and none to the existing affiliation agreement.

**(a) Allocating value to a claimed ability to affiliate is questionable.**

Whenever a taxpayer allocates a value to an ability to affiliate, the taxpayer is implicitly claiming that its VHF station has a competitive advantage over all the UHF stations in its market.

The Service has not reached a conclusion about whether an ability to affiliate can exist as an asset within the meaning of section 1031. As later discussed in this coordinated issue paper, any claimed ability to affiliate must be valued separately from the FCC license.

The penetration of cable and satellite transmissions in metropolitan areas has significantly lessened the advantage that VHF stations have over UHF stations in competing for network affiliations. In particular, where a household views local broadcast stations on a cable system or with a satellite dish, sound and picture reception quality for both VHF and UHF stations are the same. Where cable and satellite penetration is deep enough in the local market, any broadcast coverage advantage a VHF station has over a UHF station will be relatively insignificant. Currently, in a number of markets, some UHF television stations ha ve affiliation agreements while some VHF stations remain unaffiliated.

Whenever a taxpayer allocates a value to an ability to affiliate, the taxpayer is implicitly claiming that its market is balanced. The taxpayer is primarily relying on **Hearst Corp. v. United States**, 13 Cl. Ct. 178, 191 (1987), which addressed the balanced market of Dayton, Ohio in 1976. The court characterized that market as "balanced" because "three stations competed for three networks, and vice versa." Id. at 187. There were only two VHF stations, one UHF station, and three networks. Hearst Corporation owned one of the two VHF stations. Hearst Corporation simultaneously announced that it would terminate its affiliation with NBC and obtain an affiliation with ABC. Hearst Corporation claimed a loss on the termination of its affiliation with NBC. The government's expert testified that Hearst Corporation never lost its ability to affiliate. Id.at 183. The court agreed, holding that Hearst Corporation was not entitled to claim a loss when it terminated its affiliation with NBC. Id. at 191.

Unlike the balanced market in Hearst, many markets are not balanced markets. In at least 30 of the 211 television viewing markets nation-wide, there are more than four stations competing to affiliate with the four networks.

However, regardless of whether a particular market is balanced, whenever a taxpayer claims that it has an ability to affiliate because it owns a VHF station, any value allocation to that claimed ability to affiliate will be questioned.

**(b) Any claimed ability to affiliate should be valued separately from the FCC license.**

Whenever a taxpayer claims that it has an ability to affiliate, the taxpayer should value this claimed ability to affiliate separately from the FCC license. Indeed, such separation is consistent with the historic treatment of these assets by the courts. See, **e.g., Meredith Broadcasting Co. v. United States**, 405 F.2d 1214 (Ct. Cl. 1968), (affiliations treated as valuable asset, separate from FCC license such that tax loss was recognized when affiliation was lost, even though still licensed to broadcast); **Roy H. Park Broadcasting, Inc. v. Commissioner**, 56 T.C. 784 (1971)(similar presumption made as to separateness of affiliation and broadcast license); and **Miami Valley Broadcasting Corp v. United States**, 499 F.2d 677 (Ct. Cl. 1974)(same). If affiliation is an asset separate and distinct from an FCC broadcast license, there would be no logical basis for treating the ability to affiliate any differently. Also, there does not appear to be any substantive authority for merging them or treating them as part of one asset.

Taxpayers argue that their ability to affiliate is a self-regenerating asset. According to these taxpayers, even if a VHF station loses its affiliation agreement with one network, the station is virtually assured of obtaining an affiliation agreement with another network. They compare an FCC license to a sports franchise and argue that a current affiliation agreement is merely a link in a perpetual chain of affiliation agreements.

For example, in **McCarthy v. United States**, the purchaser of the Yankee baseball franchise amortized the cost of its contract with CBS to broadcast Yankee games. **McCarthy v. United States**, 807 F.2d 1306 (6th Cir. 1986), **aff'g in pertinent part** 622 F. Supp. 595 (N.D. Ohio 1985). The court denied the amortization, holding that "the current broadcasting contracts . . . are merely links in a perpetual chain of broadcasting revenues." 807 F.2d at 1311. The Major League Agreement, which was among the baseball team franchisees, provided that the franchisees would share the national broadcasting revenues. The court reasoned that this agreement was subject to perpetual renewal. The court held that as long as the Yankees remained a major league franchise, the Yankees franchisee would have the right to share in the national broadcasting revenues. Id.

The taxpayers' comparison to a sports franchise supports the position of the Service,

not the taxpayer. An FCC license does not provide a television station with any rights concerning network affiliations. In contrast, the Major League Agreement does provide the franchisees with a share of the national broadcasting revenues. This fact highlights the separate nature of an FCC license and any claimed ability to affiliate.

Some taxpayers claim that their FCC licenses include an ability to affiliate. In support of their argument, the taxpayers claim that the ability to affiliate is not a separate and distinct intangible because it is not capable of being sold separate and apart from a trade or business. See Treas. Reg. § 1.263(a)-4(b)(3)(i).

Some taxpayers may also argue that the FCC license includes the ability to affiliate because, if a station transferred its FCC license, the station would lose the ability to affiliate.

Taxpayers are correct that an FCC license is critical to a station's claimed ability to affiliate. This does not mean, however, that the claimed ability to affiliate is an additional element of value inherent in the FCC license. Other assets such as goodwill and going concern are also critical to this claimed ability to affiliate. See **Roy H. Park Broad., Inc.**, 78 T.C. at 1106 (1983) ("In selecting television affiliates, where such choice is available, the networks consider a number of factors, including the station's management, personnel, and reputation in the community, the existence of a satisfactory relationship between a station's owners and operators, and the broadcaster's experience and history in the broadcasting field"). The FCC license, goodwill, and going concern all contribute value to any claimed ability to affiliate, but that does not prevent them from being valued separately. **Laird v. United States**, 556 F.2d 1224, 1234 (5th Cir. 1977) (the court rejected the government's mass-asset theory, which was that the intangibles associated with the Atlanta Falcons football franchise were so intertwined that they could not be valued separately and therefore could not be amortized).

Some taxpayers may also make an analogy to licenses that have diminished in value. For example, some taxpayers cite **Beatty v. Commissioner**, 46 T.C. 835, 842 (1966). In **Beatty**, the Arizona legislature limited liquor licensees' ability to transfer liquor licenses. As a result, the value of licenses diminished. 46 T.C. at 839. The taxpayer continued in the liquor business. The Court held that the taxpayer was not entitled to a section 165(a) loss for this diminution in value because there was no closed transaction. Id. at 842. The taxpayers' analogy is unpersuasive. Requiring that a transaction be closed is irrelevant to requiring that any claimed ability to affiliate be valued separately from the license.

In conclusion, the network affiliation agreement and any claimed ability to affiliate must be valued separately from the FCC license.[3]

**(3) Goodwill should be valued separately from the FCC license under section 1031.**

Goodwill usually has value. A station's audience and advertisers usually have some loyalty to the station. A purchaser usually intends to continue to attract the existing audience and advertisers. Only in unusual circumstances will goodwill have little or no value. See **Jefferson-Pilot Corp. v. Commissioner**, 98 T.C. 435, 454-55 (1992), aff'd 995 F.2d 530 (4th Cir. 1993) (an unprofitable station may have very little goodwill).

Some taxpayers may claim that a station has no goodwill whenever the purchaser changes the station's format. This blanket claim is not valid. Even if a particular purchaser intends to change the format of a station, that purchaser usually pays some amount for the station's goodwill. That a particular purchaser does not intend to use this asset does not necessarily mean that the asset has no value.

**(a) The taxpayer's use of the residual method to value the FCC license is an impermissible method.**

Whenever a taxpayer allocates little or no value to goodwill, consider whether the taxpayer is using an impermissible method to value the FCC license. A taxpayer should allocate the value of the station to class I - VI assets, in that order. The taxpayer should then allocate the balance of the value of the station, the "residual," to the class VII assets, goodwill and going concern. See Treas. Reg. §§ 1.338-6(b)(2), 1.1060-1(a)(1). In sum, the taxpayer should use a "direct method" to value class I - VI assets, such as the FCC license, and should use the "residual method" to value goodwill and going concern.

Some taxpayers are impermissibly using the residual method, instead of a direct method, to value FCC license. For example, they may directly value all of the station's tangible assets and some of its intangible assets, such as going concern value. They then calculate the value of the FCC license by subtracting the value of all the tangible and intangible assets that they ha ve directly valued from the value of the station. In an effort to justify this valuation, they make three assumptions: broadcasting stations have no goodwill; the value of all other intangibles should be included in the value of the FCC license; and their method is consistent with sections 1.338-6(b) and 1.1060-1(a)(1).

All three assumptions are incorrect. First, whether a particular station has goodwill can be determined only after each of that station's class I through VI assets, including the FCC license, has been directly valued. E.g., Jefferson-Pilot Corp., 98 T.C. at 452-53 (the Court accepted the discounted-cash-flow method as a method of directly valuing

the radio stations' FCC licenses). Any residual constitutes that station's goodwill and going-concern value. Second, as already discussed in section (2)(b) of this coordinated issue paper, a taxpayer should value other intangibles, such as any affiliation agreement and claimed ability to affiliate, separately from the FCC license. Third, one of the reasons the regulations require that the residual method be used to value goodwill is to eliminate the controversy caused by the difficulty in valuing goodwill. T.D. 8215, 1988-2 C.B. 304, 305. There exists no comparable difficulty in valuing FCC licenses.

The Securities and Exchange Commission recently reached the same conclusion on this issue. They announced that registrants must use a direct method, not the residual method, to value FCC licenses and other intangible assets apart from goodwill. As stated by the SEC, "a fundamental distinction between other recognized intangible assets and goodwill is that goodwill is both defined and measured as an excess or residual asset, while other recognized intangible assets are required to be measured at fair value." **Use of the Residual Method to Value Acquired Assets Other than Goodwill**, SEC Staff Announcement (Sept. 29, 2004), citing Business Combinations, FASB Statement 141, paras. 37(e), 39, 43. (This requirement applies to acquisitions completed after the anno uncement date, September 29, 2004. Registrants that have already used the residual method to value intangible assets other than goodwill for purposes of impairment testing must perform an impairment test using a direct method by no later than the beginning of their first fiscal year beginning after December 15, 2004.)

In conclusion, a taxpayer using the residual method to value the FCC license is using an impermissible method and may be overstating the value of the FCC license and understating the value of goodwill.

**(b) The taxpayer must value goodwill separately from the FCC license.**

A station's goodwill is valued separately from, and not included in, its FCC license. Cf. Rev. Proc. 75-39, 1975-2 C.B. 569, 571; Rev. Rul. 57-377, 1957-2 C.B. 146 (stations may be divided up into several types of assets, including the FCC license, the network affiliation agreement, and goodwill). This is because the assigned frequency of the electromagnetic spectrum is the sole underlying property to which the license relates.

Some taxpayers argue that they cannot value goodwill separately from the FCC license because an FCC license is analogous to a McDonald's franchise.

This analogy to a McDonald's franchise is incorrect. In **Canterbury v. Commissioner**, 99 T.C. 223, 247-8 (1992), the Court found that a McDonald's franchise encompasses attributes that have traditionally been viewed as goodwill. Id. at 247-8. To the extent the McDonalds franchise embodies these assets, the Court found that the cost of these assets is amortizable under section 1253(d)(2)(A). **Id.** at 257.

While an FCC license and a McDonald franchise are both "franchises," within the meaning of section 1253(b)(1), **Jefferson-Pilot**, 98 T.C. at 446, the analogy ends there. Goodwill is the value attributable to the expectancy of continued customer patronage. **Canterbury**, 99 T.C. at 247; Treas. Reg. § 1.1060-1 (b)(2)(ii). For a McDonald's franchisee, this expectancy "flows from the implementation of the McDonald's system and association with the McDonald's name and trademark." 98 T.C. at 248. In contrast, a station's expectancy of continued customer patronage does not flow from its FCC license. In other words, people do not listen to a particular radio station because the station has an FCC license. They listen because they appreciate the station's characteristics, such as its local reputation, its national affiliation, and its programming.

In conclusion, whenever a taxpayer allocates little or no value to goodwill, consideration will be given to whether the taxpayer is impermissibly using the residual method to value the FCC license and whether the taxpayer valued goodwill separately from the FCC license.

**(4) Accuracy-related penalties should be fully developed whenever a taxpayer fails to use a direct method to value the FCC license.**

If a taxpayer uses the residual method, instead of a direct method, to value the FCC license, examiners should fully develop accuracy-related penalties. (Examiners should always consider penalties whenever a taxpayer misstates the value of a station's assets.) By using the residual method, instead of a direct method, to value the FCC license, the taxpayer has assumed that goodwill has no value. Use of that assumption indicates that the taxpayer lacked a reasonable cause and did not act in good faith under section 6664(c). In that event, the taxpayer would be liable for the penalties under section 6662(a) for negligence or substantial valuation misstatement.

**Contacts**

The Media Technical Advisor may be contacted for questions pertaining to this coordinated issue paper.

**Footnotes:**

[1] Taxpayers must allocate the value among seven classes of assets (Class I – Class VII). Treas. Reg. §§ 1.338-6(b)

(2); 1.1031(d)-1T; 1.1060-1(b)(8).

[2] This coordinated issue paper does not address whether television and radio network affiliations agreements are like-kind property. That may depend on the facts and circumstances surrounding the particular agreements. The issue is unlikely to arise because taxpayers generally attribute a negligible, if any, value to a radio affiliation agreement.

[3] The Service has not reached a conclusion about whether an ability to affiliate can exist as an asset separate from the affiliation agreement. Moreover, the Service may conclude, for example, that an ability to affiliate exists only as part of going concern or goodwill.