KIRTON & McCONKIE
ATTORNEYS AT LAW

**(PRELIMNARY DRAFT)**

**To: W.C. Rapp**
**From: E.C. Olson**
**Date: 12 Jan 2007**
**Re: Discovery Issues**

---

Bill-

I thought it would assist our discussions if I were to set down in outline form our priorities with regard to the pending discovery issues. These issues include not only those raised in the motions to compel but also issue arising from the discovery requests served by the Government. Our priorities are informed, in part, by the simplicity of any resolution of the issue and the impact of such resolution on the breadth of the case.

1. **<u>Admissions/Interrogatories</u>**

**KIRO Assets**

The first 104 requests track numbers set forth in paragraphs 48 and 90 of the Complaint. Since we did not obtain unqualified admission to those paragraphs that the values attributed to the Service were, in fact, the numbers on which the Service relied, we sought that admission in discovery.

The proposed admissions were broken down into 26 separate groups of four each relating to specific assets identified in NOPA 41-1 and included in paragraphs 48 and 90 of the Complaint. We sought to establish four connections:

a. NOPA 41-1 value of asset with determination of tax liability in the thirty-day letter.

b. NOPA 41-1 value of asset with amount of tax collected from DMC.

c. NOPA 41-1 value of asset with calculation of increase in tax set forth ini the 2005 notice of deficiency.

d. NOPA 41-1 value of asset with reality.

The Government admitted (c) and deferred response to (d) until it had obtained an expert report, but it professed to have insufficient information to respond to (a) or (b) because the thirty-day letter did not “provide a breakdown for the value of the asset identified in this request.” These requests, 52 in all, should have been admitted. First, Mr. Druk who signed the thirty-day

letter on behalf of Ms. Tapley (or his associates Brad Nance, Mark Howard and Neal Nelson) should know the source of the calculations and that source should know whether or not those calculations were based on the numbers in NOPA 41-1. Obtaining an answer to these questions, without requiring DMC to draw a map for the Government, is a matter of a few phone calls to the right people. (As you would no doubt agree, this is what litigators always have to do in formulating responses on behalf of large organizations. Very few documents set forth on their face how the author reached the conclusion. That is why we had to seek an admission.) As you have observed, the tax liability alleged and assessed in this matter is the sum of the gain on numerous assets sold by Bonneville International. The entity alleging and assessing that liability necessarily knows what individual components make up the sum of gains shown in the thirty-day letter.

That said, it appears that a more expeditious way to secure an admission to these rather self-evident statements is to provide you with the "map" referenced above. Here is how I have tied the NOPA to the thirty-day letter:

- Start with the thirty-day letter (Ex. A to the Complaint) and proceed twelve pages in to Form 4549-B noting adjustments to income for years 12/1994, 12/1995 and 12/1996. There you will find the number $50,244,261 under 12/1995 for Non-Life Adjustments and the number $81,770 for the "Life Adjustments." These total $50,326,031.

- Twenty-seven pages into the same Exhibit A to the Complaint (but not a part of the thirty-day letter according to the Government) is a document from the Service headed "Schedule of Payments." Under the heading "1995 Amount" are a series of entries each tied to a NOPA number listed in the far left column.

    - First note that the "Total Adjustments" listed about two-thirds of the way down the page for the column "1995 Amount" is $50,326,031, matching the sum of the entries for adjustments in Form 4549-B.

    - Next, note the entries immediately above the entry for "Total Adjustments" in the 1995 column:

        - In the row labeled "41-1 KIRO Gain from Sale – LTCG" is the number $39,768,363.

        - In the row labeled "41-1 KIRO Gain from Sale – Ordinary" is the number ($3,202,292).

- Further along in Exhibit A to the Complaint (the last two dozen pages or so) is NOPA 41-1.

    - Ignoring the cover page (received by DMC but apparently not found in the Service's files), the first page of the NOPA on Form 5701 is summary signed by Monty A. Careswell. In the middle of that summary page are the number

39,768,363 "Long Term Capital Gain" and (3,202,292) "Ordinary Gain" as "proposed adjustments."

- Pages 2 through 5 of NOPA 41-1 set forth the calculations resulting in the proposed adjustments noted on the summary page. You can confirm this by first checking the totals shown on page 5.

- Returning to page 2 of NOPA 41-1, you will see that there are 26 assets identified (disregarding "Rounding," which is not an asset as far as we can determine).

- Listed next to each asset in the column headed "Per Exam FMVs ($)" is the identical value as that listed for each asset in request for admissions Nos. 1 through 104.

- From page 2, you can follow the manner in which the calculation incorporates each of these values to arrive at the numbers on page 5.

In sum, this "map" confirms what was alleged in the Complaint and set forth in the admissions. I am confident that Mr. Druk, who signed the thrity-day letter, or Mr. Nance, who signed Form 4549-A, or perhaps Mr. Careswell, who signed NOPA 41-1, or some combination thereof – all as disclosed in the materials attached to the Complaint – could have verified for your predecessor that the connection alleged between the thirty-day letter and NOPA 41-1 in fact existed. I can only conclude that she failed to consult them.

If Requests Nos. 1, 2 ... 5, 6 … 9, 10 … *etc*. to 101, 102 are admitted (a total of 52 admissions – two per each asset), DMC would drop its motion to compel as to Interrogatories Nos. 1 and 12.

**Consideration and Basis**

Requests Nos. 105 through 108 seek to establish the amount of consideration received by Bonneville International and its basis in the assets sold as part of KIRO-TV. The numbers listed in these requests were taken from page 3 of NOPA 41-1, again numbers utilized by the Government to calculate the tax assessed.[1] Again, a call to Mr. Careswell would have been an excellent starting point for verifying the truth of these admissions. I am not aware of anyone who has cast doubt on these facts over the last twelve years. It would seem that an inquiry into this subject matter would be step one in any audit of the transaction. An admission of these facts or some clearer explanation as to why they cannot be admitted would resolve DMC's motion to compel as to Interrogatory No. 4.

**CIP References**

Stipulation on the CIP would resolve the motion as to Interrogatories Nos. 5, 6 and 11.

[1] I would note that it appears the number listed as consideration should have been $52,729,929 rather than $5,529,929.

**Goodwill**

Requests Nos. 112 and 114 seek admission on what Mr. Bivins said in his report regarding "goodwill." They are almost direct quotes from Bivins 1998 report. *See* Bivins 1998 at 20 and 36. He has admitted as much in his deposition. The Government advanced a misreading of the report to deny the admission. While one might say that, if it is in writing and acknowledged by the author who cares what the Government states in response to the request, but this was originally alleged in the Complaint and put forward in the admissions *before* the Bivins deposition. DMC is entitled to an honest and complete (non-evasive) response so that, to the extent relevant to the present action, this simple fact is established and not the subject of further evidence or dispute.

**Reliance on NOPA 41-1**

Based on the "map" set forth above and a further comparison of page 2 of NOPA 41-1 with page 3 of Bivins' 2001 report (Ex. 3, Tab 7 to Bivins dep.), the Government should admit without qualification Requests Nos. 116 through 119. If the Government persists in qualifying its response, it should specify what portions of NOPA 41-1. Perhaps the inclusion of the December 1998 report in each request led, in part, to the qualified response. However, we should not have to guess and the Government should at least identify what valuations it did not rely upon.

2. **<u>Government Discovery Requests</u>**

**Rule 30(b)(6) Deposition**

We need to resolve whether this deposition is going forward on January 29, 2007, and whether the Government still wants to cover each of the 42 subject matter categories listed in the notice. I am proceeding as if you will take the deposition as noticed.

Notwithstanding, as we have discussed, both the number and the breadth of those categories makes the proposed deposition very unwieldy. I took the time to correlate the categories with the request for production of documents. All but five of the categories correspond directly with requests for production of documents. Inasmuch as twelve years have passed since the KIRO sale and the few persons still within DMC's control who had any involvement with the sale have dealt with the matter (the V-P tax for DMC who *has* been directly involved in the audit and subsequent proceedings joined the company after the KIRO sale), it is quite unlikely that anyone can add much to what the documents disclose.

The definition of "DMC affiliate" presents substantial problems, not only because it is stated in a very confusing fashion but because it reaches far beyond the set of companies over which DMC exercises any control. In the context of this dispute, DMC can respond only for itself and Bonneville International (and its subsidiaries).

Finally, the categories themselves are most broad. I trust you can anticipate the challenge in putting forth meaningful testimony on topics as broad as those stated in categories 14 or 15,

assuming I can parse these paragraphs (which together gobble up nearly an entire page) with sufficient skill to ascertain what it is the Government seeks. Further problems arise when testimony is sought regarding the acquisition of KIRO's FCC license (Category 42), an event that occurred in 1964. (I have reflected that perhaps this deposition should proceed as to this category with the aid of a Ouija board since no one alive now has the slightest personal knowledge of the acquisition of the FCC license.)

**Request for Production**

Most of the items listed in this discovery request were produced many years ago as part of IDR responses. *See* Request No. 29. I have personally seen much of this in the seven boxes of the administrative file produced in October 2006. Trying to tie the disparate categories in the request to the IDRs is an undertaking I will leave to the Government but (a) I am confident the IDR responses are in the possession of the Government and (b) we can duplicate that production.

Some of the requests appear to be nonsensical. For instance, the first three seek documents that the Government already has in its possession. The response to No. 3 consists of documents attached to the Complaint as Exhibits C through F. It just seems silly to force DMC to respond to such requests. Some are unbelievably broad. For instance, Nos. 41 and 42 would require DMC to produce documentation as to all of its subsidiaries long after the years (or issues) implicated were resolved. The issue in this litigation is *how* to do the calculation *after* resolution of the central valuation issue. That does not require a wholesale production of documentation from more than a dozen subsidiaries simply to establish numbers never in dispute during the audit. Some ask for things almost impossible to duplicate: all electronic mail from 12 years ago (Requests Nos 12 and 13) and all documents reviewed 12 years ago (Request No. 14). What the audit teams sought (and received) in 1997 and 1998 through the IDRs (largely guided by Mr. Bivins) will be the sole evidence responsive to such requests.

We invite you to review the requests and, in consultation with someone who was involved in the audit such as Mr. Howard or Mr. Nance, narrow the request to documents the Government doesn't already have.

**Interrogatories**

DMC will respond to these on January 22, 2007. I note that the interrogatories far exceed the limit of 25. Nonetheless, DMC will address the substance of each interrogatory.

3. **Privileged Documents**

These present quite a tangle given the volume of material that the Government has identified and the fitful way in which we received the privilege logs and declarations. You have invited us to prioritize these materials to expedite your reconsideration of the designations to date. Given the constraints on our schedules, I can only offer the following as an attempt to simplify things:

a. Second Supplemental Logs I through III. These are the documents retrieved from Bivins and should be produced.

b. Correspondence to which Mr. Careswell was a party. Mr. Careswell has offered his opinion as an expert and signed NOPA 41-1. We have noticed his deposition. I cannot take that deposition until the status of correspondence to which he was a party is resolved. I have attached an electronic version of the summary prepared by Ken Birrell so that you can search for the documents that fit this description.

c. Documents referencing the CIP (to the extent that the parties fail to agree on a stipulation regarding the CIP). I will need these to conduct the Rule 30(b)(6) deposition that we have noticed.

d. Documents predating March 28, 2002. These documents set forth the facts on which the Government relied in creating the thirty-day letter. Because the issue between the parties arising out of that letter that is now before the Court is one of fact, DMC seeks to understand that issue and the factual basis underlying it by reviewing these materials.

e. Post March 28, 2002 documents (non-Careswell). These have the lowest priority because there is no pending deposition to which they would be relevant and many may deal with appeals or mediation strategy. However, to the extent that such documents set forth discussions on the calculation of DMC's taxes, we seek their production.