**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DESERET MANAGEMENT CORPORATION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **No. 06-86 T** |
| **v.** | § | **The Honorable Emily C. Hewitt** |
| | § | |
| **THE UNITED STATES,** | § | |
| | § | |
| **Defendant.** | § | |

**MOTION OF THE UNITED STATES**
**TO AMEND THE PRETRIAL SCHEDULING ORDER**

Defendant, the United States, respectfully moves to amend the present pretrial scheduling order, as set out in detail in the attachment hereto, by enlarging the various deadlines by approximately four months. The additional time is necessary in part so that defendant's experts may perform their research and analysis in an orderly and responsible fashion, and in part so that defendant's attorneys may pursue further discovery in a careful, focused and rational manner.

As good cause therefor, defendant states as follows:

In the last six weeks, both the Government and the Court have expended enormous effort on this case, and (aside from the Court's continuing *in camera* review of documents) all pending discovery disputes have been resolved. The Government served on plaintiff amended responses to plaintiff's requests for admission and to plaintiff's related interrogatories. The Government responded to plaintiff's renewed motion to compel and the Court, after an extensive hearing,

acted on that motion, and required additional submissions. All such materials required from the Government were filed or served promptly, in most instances before they were due. In addition, the Government (having learned that counsel for plaintiff would be in Washington on February 14) flew Montgomery Careswell to Washington from Denver in order that he might be deposed by plaintiff. Thus, all witnesses whom plaintiff sought to depose have been deposed. For months, the efforts of the Court and the Government have been consumed with plaintiff's discovery. Plaintiff's discovery is now complete.

At the hearing on November 29, 2006, plaintiff's counsel, addressing questions regarding the scheduling of plaintiff's deposition of Government witnesses, and plaintiff's other discovery, represented (Tr. 53):

> And therefore I thought let me get [plaintiff's discovery] out of the way early, and we leave the field clear for Ms. Spriggs to conduct her discovery and fill in the gaps that are perceived by the Department of Justice to exist in the materials that they have.

Plaintiff's discovery is now out of the way, and it is time for the Government to be permitted to move this case forward. But doing that will require an adjustment of the present schedule.

As the Court is aware, since his assignment to this case our trial attorney has pursued the retention of appropriate expert witnesses. Such witnesses will be necessary to present evidence, and to respond to expert opinion evidence expected to be offered by plaintiff with respect to the value of the assets of KIRO-TV at the time of its sale in February 1995. The main issue in this case involves the allocation of the gain from that sale between plaintiff (a taxable subsidiary of the Church of Jesus Christ of Latter-day Saints) [1/] and Bonneville Holding Company (a tax-

---

[1/] The assets were actually owned by a taxable subsidiary of plaintiff, "Bonneville (continued...)

exempt subsidiary of the Church). At the time of the sale, the tax exempt subsidiary owned the FCC license for the station, while plaintiff in the instant suit owned all of the remaining assets of KIRO-TV. The question is the relative values of these assets, and hence the proper allocation of the purchase price and the resulting gain between the taxable and the tax exempt entities. Experts will testify respecting these values.

The process of securing such testimony requires great care and considerable time. Potential experts must be identified and then interviewed, and their qualifications and particular expertise respecting the issues in this case reviewed and evaluated. Not all qualified witnesses will be able or willing to undertake the project. Some are unable to perform because of other, existing work commitments. Others must be eliminated because of actual or potential conflicts of interest. And still others eliminate themselves because they are concerned that if they appear on behalf of the Government, they will alienate private parties who are likely (in the long run) to be in a position to provide rather more repeat business than is the Tax Division. [2/] Such obstacles often surface only after a material amount of time and effort has been invested in pursuing a particular potential expert. Only after suitable, available experts are identified may formal contracting begin, a process that consumes approximately four weeks, even if no delays are encountered. It thus can take as long as two months before contracts are in place and a potential witness can actually begin work.

---

[1/] (...continued)
International Corporation," not to be confused with "Bonneville Holding Company," the tax-exempt owner of the FCC license.

[2/] At present, according to its website, Bonneville Holding Company (plaintiff's sister corporation) owns the licenses for a television station and 24 radio stations, including WTOP and Washington Post Radio in Washington, D.C.

Since his assignment to this case shortly after the New Year, in addition to attending to those matters briefly addressed above, of which the Court is already aware, our attorney has interviewed and vetted potential expert witnesses, and identified those he wishes to place under contract to perform analysis, and perhaps to testify. The contracting process is not complete with respect to all such witnesses, and some of the time requested herein is necessary for completion of that process.

Between contract signing and a final written report each expert must determine what data is necessary and available, secure that information, evaluate and analyze it, draw conclusions and test those conclusions, and then prepare a written summary of what has been learned. We are advised that in this case these tasks will require between eight and ten weeks – more if information is not readily available, or unanticipated problems are encountered. While the Government is already in possession of important information respecting the relevant transactions, expert witnesses very often identify new factual information that they find necessary for their work to proceed properly. Some of the time requested herein is necessary for our experts to determine if they need additional information and for us to secure that information, if necessary by discovery directed to plaintiff or third parties.

But even upon the production of a written report, the work is not done, and that report is not ready to be turned over to plaintiff. Time must also be provided for defendant's attorneys to review the result of their expert's work, and to evaluate how it will be used. The expert's evaluation may suggest that settlement – or even concession – is a realistic possibility. The schedule should provide adequate time properly to review such prospects, both within the Government and between the parties. Most valuation cases are settled, and a schedule that

accommodates a full opportunity to gather facts, apply expert analysis, and consider the views of all experts is indispensable to meaningful settlement discussions.

The current schedule calls for an exchange of expert reports in little more than nine weeks from now. As explained above, the work which must be performed in this respect cannot be done within the present schedule, but can be done within the revised schedule which we are requesting.

The time requested is also necessary for the Government to pursue discovery in a manner calculated to be both efficient and effective. The Court will recall that the Government served plaintiff with discovery (interrogatories and a request for production of documents) on December 20, 2006. Responses to that discovery, which were due under the Rules on or before January 22, 2007, were received instead on February 15. [3/] Plaintiff's responses were disappointing in that they provided very little of the information requested. A good portion of the time requested herein is necessary for the Government to resolve the matter of plaintiff's unhelpful responses, either by agreement with plaintiff, by acquiring the necessary information from third parties, or by undertaking additional discovery. Only as a last resort will we turn to the burdensome and time-consuming remedy of a motion to compel. But we need the time requested herein in order to pursue other avenues to obtaining the necessary information.

This is not a motion for sanctions or to compel discovery, and we will therefore not burden the Court with a detailed or comprehensive presentation of the oddness of plaintiff's responses. As noted, it is our goal to avoid filing a motion to compel. But we must refer to some

[3/] The Government has not objected to this 3 ½ week delay, and does not do so now. It is nonetheless a matter of fact.

of plaintiff's responses so that the Court may gauge the task we face in gathering the information needed (already in plaintiff's possession) to properly defend against plaintiff's suit.

Some of our discovery sought information or documents known to or in the possession of "affiliates" of plaintiff, a term we defined to include plaintiff's parent and subsidiary corporations, as well as parent and subsidiary corporations of those entities. The structure and the identity of the network of corporate entities used by the Church of Jesus Christ of Latter-day Saints to hold and manage its extensive properties has undergone several realignments over the years, and the properties acquired, owned, or sold have been transferred between and among several of these entities from time to time. We thus sought to include not only the sole owner of plaintiff, but Bonneville Holding Company, the entity which held the FCC license for KIRO-TV until it was sold to a third party. Our discovery included requests for information respecting other transactions involving broadcasting properties, and how plaintiff (or plaintiff's owners, or other subsidiaries used for that purpose by plaintiff's owners) had treated those transactions. But because of reorganizations and property transfers, information limited to that within the narrow custody of "plaintiff" would be singularly unhelpful. Thus, our request for information from both plaintiff and plaintiff's "affiliates" was necessary.

Plaintiff has limited its response to itself and its subsidiary, refusing to provide information from other components of the web of corporations of which plaintiff is only a part:

> These responses present solely the knowledge of DMC, the plaintiff herein, and its subsidiary Bonneville International Corporation ("BIC"),[ [4/]] the entity that realized the asserted gains on which the taxes in dispute were paid.

---

[4/] Not to be confused with "Bonneville Holding Company," the tax-exempt owner of the FCC license, a sister corporation to plaintiff, also owned by the Church of Jesus Christ of Latter-day Saints.

Thus, plaintiff washes its hands of any information known to its owners (who obviously directed and approved plaintiff's actions) or known to the sister corporation (the corporation that owned the station's license to operate) with whom it participated in the transaction that is at the center of this case. We think plaintiff's recalcitrance to be without legal support. [5/] But the question is not whether these materials would be forthcoming after the preparation of an extensive motion to compel, followed by argument, followed by an opinion by the Court. The question is how best to secure that which we seek, under the circumstances now presented, and how to secure it as promptly and efficiently as possible. We believe a *subpoena duces tecum* to plaintiff's owner – the Corporation of the President of The Church of Jesus Christ of Latter-day Saints – may be a more expeditious route. But whatever course we adopt, it will take time to be formulated and carried out in a reasonable and careful way: more time than allowed by the present schedule.

Other responses by plaintiff to our discovery present additional problems that will require substantial time to resolve. As the Court is aware, this case presents two issues aside from that involving the sale of KIRO-TV. The first has to do with the proper charitable deduction limitation (Compl. ¶ 116), while the second relates to the proper net operating loss deduction that should have been allowed (Compl. ¶ 119). The Government is pursuing the notion that these issues are purely legal, and thus susceptible of disposition by summary judgment. While we have not yet reached a firm conclusion in this respect, our discovery asked plaintiff to "state the facts"

---

[5/] *See, e.g., Gerling International Ins. Co. v. Commissioner*, 839 F.2d 131, 140–141 (3rd Cir. 1988); *Japan Halon Co. v. Great Lakes Chemical Corp.*, 155 F.R.D. 626 (D. Ind. 1993); *Camden Iron & Metal, Inc. v. Marubeni America Corp.*, 138 F.R.D. 438, 442 (D.N.J. 1991); *Afros S.P.A. v. Krauss-Maffei Corp.*, 113 F.R.D. 127, 132 (D.Del. 1986); *Cooper Industries, Inc. v. British Aerospace Corp.*, 102 F.R.D. 918, 919 (D. N.Y. 1984).

on which it relied for its contention that proper resolution of these issues resulted in a recovery of tax. With respect to the charitable contribution issue, plaintiff responded:

> This contention is based on DMC's position that the IRS's use of the subgroup method rather than the consolidated/non-life taxable income method to determine the charitable contribution limitation for DMC was erroneous as a matter of law. This is fully set forth in the Complaint.

With respect to the proper net operating loss deduction, plaintiff responded:

> This contention is based on DMC's position that the IRS's determination of law and the application of that law were erroneous as set forth in the Complaint.

These answers provide no facts, let alone evidence of any facts. They are naked legal conclusions. Review of those paragraphs of the Complaint which reference these issues (see, e.g., ¶¶ 100 - 106, 114 - 119) shows them to be similarly free of facts, while rich in legal conclusions. Thus, plaintiff has provided no information in response to discovery to apprise defendant of the factual predicate of its claims, or to permit defendant to evaluate the potential resolution of these claims. We had thought that the most straightforward approach was to ask plaintiff – via interrogatory – to marshal the facts upon which its claim rests. But plaintiff has refused. The Government will therefore be required to prepare and serve further discovery, which may well take the form of requests for admission. This, of course, will require the Government to speculate regarding the particular facts which plaintiff believes to be relevant to its claim. These are tasks which we are prepared to undertake. But preparation of that discovery, followed by review of plaintiff's responses with an eye toward dispositive motions, will require additional time.

Elsewhere in its responses to our discovery, plaintiff has responded in other ways that are unhelpful, again resulting in wasted time and effort, and again requiring the Government to do additional work, and to consume additional time. The Court will recall that in the course of one of the conferences respecting this case, plaintiff complained that many, most, or all of the documents the Government sought had already been provided to the Internal Revenue Service in response to what are called "Information Document Requests" ("IDRs"). We thus expected plaintiff to advise in its responses where this or that document had already been produced. But plaintiff has not done so. Instead, plaintiff has responded repeatedly with a generalized "any documents responsive to this Request were produced as part of the IDR Responses" or "to the extent not otherwise produced in the IDR Responses, these documents will be produced." Defendant's attorneys are thus left to review all documents previously produced to the Internal Revenue Service, and guess which ones plaintiff means. This is work plaintiff has already done – if its responses are accurate. [6/] There is no reason for plaintiff to have failed to provide such information rather than to burden defendant with recreating it. This is a task we are presently undertaking, but one which will require additional time, which we request herein.

Other responses seem (at best) odd. For example, when we asked plaintiff to produce documents that had been provided to its board of directors respecting the fair market value of KIRO-TV, or the allocation of the purchase price, plaintiff responded that no such documents existed. Similarly, when asked to produce insurance policies covering any of the assets sold

[6/] Of course, the phrases "any documents responsive" and "to the extent not otherwise produced" do not necessarily include a representation that there actually are any such documents, but may mean no more than that plaintiff doesn't really know if there are any responsive documents, but it is nonetheless somehow quite certain that – if there are any – surely they were previously produced.

(which policies might include information respecting plaintiff's view of the insurable values of those assets), plaintiff both objected that such information was not discoverable, and then answered that no such documents could be located. Both these (and other) peculiar responses [7/] will require the Government to prepare additional discovery, or to seek the necessary information from sources other than plaintiff. And these are tasks which will require additional time properly to complete.

Finally, as touched on above, we ask that fact discovery be extended so that, as our expert witnesses do their work, it is possible for the Government to use discovery to request from plaintiff (or third parties) any additional information those experts may learn that they need for that work. Plaintiff, as the party already in possession of all of the facts, faces no similar potential problem or limitation. Its experts have access to all documents and knowledgeable individuals at all times, since such documents are already in plaintiff's possession, and such witnesses are present or former employees of plaintiff or its affiliates.

For some time now this case has proceeded at a furious pace, demanding nearly the full-time attention of our attorney. Our attorney has on his docket cases considerably older than this one, several with considerably more at issue, and many presenting issues of far greater legal significance. Over the coming months, defendant's counsel must also devote time and attention to those cases. As to the instant case, there is simply no basis to conclude that it warrants special, expedited handling, due to the age or illness of key witnesses, financial difficulties facing plaintiff, or any other reason.

---

[7/] Asked to identify those persons with knowledge of the facts "involved with the planning, negotiation and sale of KIRO-TV," plaintiff has objected that the word "planning" is "ambiguous and unclear," while the word "sale" is "overly broad."

Plaintiff has advised that it will oppose this motion. We will thus hear argument about Government delays, and the necessity and complexity of plaintiff's discovery (none of which has established even a single material fact not already known to plaintiff, or uncovered any relevant evidence not already in plaintiff's hands). To date, plaintiff's complaints about the Government have consumed enormous amounts of time on the calendar, and they have required the expenditure of immense effort by both our attorney and the Court. Plaintiff does not object to this amended schedule because it will be injured by the modest amount of time requested, which can neither hurt plaintiff nor materially delay final resolution of this case. Plaintiff's motive appears to be to prevent the Government from having sufficient time to prepare a proper defense. But plaintiff can provide no reasons, such as hardship or prejudice, which might even be weighed against the prejudice to the Government should the instant motion be denied.

WHEREFORE, defendant prays its motion be granted, and the Order of January 19, 2007, be amended to provide for the various pretrial deadlines as set out in the attachment hereto.

Respectfully submitted,

s/ W. C. Rapp

W.C. RAPP
Attorney of Record
*United States Department of Justice*
*Tax Division*
*Court of Federal Claims Section*
*Post Office Box 26*
*Ben Franklin Post Office*
*Washington, DC 20044*
*Voice: (202) 307-0503*
*Fax: (202) 514-9440*
*Email: william.c.rapp2@usdoj.gov*

EILEEN J. O'CONNOR
*Assistant Attorney General*
DAVID GUSTAFSON
*Chief, Court of Federal Claims Section*
STEVEN I. FRAHM
*Assistant Chief, Court of Federal Claims Section*

February 26 , 2007

s/ Steven I. Frahm
Of Counsel

**Attachment to**
**Motion of the United States**
**to Amend the Pretrial Scheduling Order**

| | Present Schedule | Proposed Schedule |
|---|---|---|
| Fact Discovery Concludes | February 28, 2007 | June 27, 2007 |
| Expert Discovery Concludes | July 25, 2007 | November 28, 2007 |
| Expert Reports Exchanged | April 25, 2007 | August 29, 2007 |
| Expert Depositions Completed | May 23, 2007 | September 26, 2007 |
| Rebuttal Expert Reports | June 20, 2007 | October 24, 2007 |
| Rebuttal Expert Depositions | July 25, 2007 | November 28, 2007 |
| Contact Court re Conference | July 25, 2007 | November 28, 2007 |